UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA , | ) | CASE NO. SA CR 08-177 DOC |
| Plaintiff(s), | ) | |
| | ) | O R D E R DENYING MOTION FOR |
| v. | ) | NEW TRIAL |
| STEPHEN T. HARD, ET AL., | ) | |
| Defendant(s). | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

Before the Court is Defendant Stephen T. Hard ("Hard")'s Motion for New Trial (the "Motion"). The parties appeared for a two-day hearing on this matter April 19, 2010 and April 20, 2010, and the Court continued the hearing to June 23, 2010. Upon considering the moving, opposing, and replying papers, as well as the documents attached thereto, the Court DENIES the Motion.

**I.      Background[1]**

---

[1] At the outset, the Court declines to strike the Hard Affidavit, as well as the Exhibits to that Affidavit. The government is correct that Hard's Affidavit provides an

1       The Indictment charged Hard with one count of conspiracy and eight counts of

2 wire fraud and aiding and abetting wire fraud.  *See* Docket 1.  The case against Hard proceeded

3 to trial.  On December 3, 2009, on the ninth day of trial, the jury returned a guilty verdict as to

4 all nine counts.  Hard moves for a new trial pursuant to Fed. R. Crim. P. 59.

5        **A.     The Government's Allegations**

6       The charges against Hard arise out of an alleged scheme to defraud Consolidated

7 Consulting Group (CCG) and its officers out of $1 million.  Specifically, the government alleged

8 that Hard and his co-conspirator Brad Keith Lee ("Lee") presented CCG with a so-called high

9 yield investment scheme, which purported "privileged access to secret financial trading

10 programs" which falsely promised high rates of immediate return on modest investments.  *See*

11 Docket 1 ¶ 5.  In effectuating this scheme, Lee and Hard were alleged to have transferred $1

12 million in CCG assets to the control of a foreign individual purportedly named Claude Cressot.

13 Hard and Lee were alleged to thereafter "lull" the CCG investors into believing that their funds

14 would soon be invested, only to manufacture false explanations for their failure to either invest

15 the CCG funds or return the funds to CCG.  Lee and Hard were alleged to have eventually

16 terminated contact with the CCG investors.

17       Hard's role in the alleged scheme related to his standing as an attorney licensed to

18 practice law in the state of Utah.  The government alleged that Lee represented himself to

19 investors as a high-ranking United States military official with extensive contacts within the

20 financial world.  Lee, and thereafter Hard, informed investors that Lee controlled significant

21 funds in worldwide bank accounts, all of which had been temporarily frozen.  Hard's alleged

22 role was to memorialize the agreement between Lee and the unwitting victims of Lee's fraud

23 scheme and later use his credentials as an attorney to "lull" the CCG investors into a false sense

24

25 _____

26 account of the events central to this prosecution that is not subject to cross-examination.
To the extent that is the case, the Court declines to consider the Affidavit or attached

27 Exhibits.  Nevertheless, the contents of the Affidavit, as well as the exhibits, are relevant
to Hard's claim that the government elicited testimony that it knew to be false on the

28 basis of records it had in its possession.

1   of security about the integrity of their investments.

2          **B.     Relevant Evidence Presented at Trial**

3          The government called a number of witnesses, including the CCG investors, the

4   FBI investigating agent Norm Embry, Lee, and Lee's companion Kristine Montesa.  Lee

5   testified that Hard was aware of, complicit in, and a participant to the alleged defrauding of the

6   CCG investors both before and after their funds were transferred out of their custody.  Lee's

7   testimony was used to rebut Hard's defense, which – as Hard observes – was predicated upon

8   Hard's lack of "requisite specific criminal intent to commit wire fraud and to aid and abet Lee's

9   effort to do so."  *See* Mot. at 2.

10          The government also submitted for the jury's consideration an array of

11   documentary evidence, including Hard's e-mail correspondence with the CCG investors, Hard's

12   e-mail correspondence with Lee, and bank records purporting to track the transfer of the CCG

13   investors' funds.  The following categories of documentary evidence are relevant to the

14   resolution of the instant Motion.

15          First, the government submitted the agreements that were prepared by Hard and

16   signed and initialed by CCG's representatives, Brad Lee, and Hard.  A September 23, 2004

17   "Joint Venture Agreement" memorialized CCG and Lee's agreement to make available $1

18   million in CCG funds for Lee to, *inter alia*, use in "private placements of purchases and sales of

19   bank debentures or other instruments."  *See* Ex. 1-A to Opp. to Mot. at 4.  On October 5, 2004,

20   Hard e-mailed the CCG investors informing them on the manner in which their funds could be

21   transferred to Lee's control.  Specifically, Hard instructed the investors to either: (1) engage in a

22   potentially unavailable "'K9' transaction which allows funds to be transferred quickly between

23   Europe and the US if the signatories to both accounts are the same" or (2) transfer funds to

24   Hard's "lawyer trust account" from which the funds would be disbursed "to the account of

25   Claude Cressot."  *See* Ex. 1-C to Opp.  An October 14, 2004 "Joint Venture Agreement"

26   memorialized CCG and Lee's agreement to transfer $1 million in CCG funds to Hard's lawyer

27   trust account for later disbursement to an overseas account.  *See* Ex. 2 to Opp.  Hard received

28   CCG's funds and later transferred them to the overseas account, as per the agreement.  *See* Ex.

1  4-A to Opp.

2       Second, the government submitted Hard's correspondence with CCG investors in

3  which Hard described the nature of the investment.  For the purposes of this Motion, it suffices

4  that Hard repeatedly referred to the investment as "leveraging."  For example, on October 24,

5  2004, Hard e-mailed the CCG investors stating that "Cressot has received the funds . . . he will

6  start the leveraging process on Tuesday . . . The first tier of leveraging won't begin until then . . .

7  once that is done, he needs to move the funds to a different account in order to enable the

8  leveraged funds to be further leveraged." Ex. 6 to Opp.  The investors apparently believed that

9  their funds were undergoing "leveraging" as one of the CCG investors e-mailed Hard a week

10  later stating "It was great to talk to Brad, Kristine and you about the updates.  As per our

11  conversation during lunch, Claude should have leveraged our account to a certain level at this

12  time." *See* Ex. 7 to Opp.

13       Indeed, even as it became apparent that the investment was not the success it was

14  made out to be, the CCG investors expressed gratitude that "Brad/Cressot already levereaged our

15  funds to a certain level . . . even if we don't get approved, we still made some leveraging and at

16  least get some profits out of this."  Ex. 18 to Opp.  Hard later assuaged the investors' concerns

17  about the status of their funds by attempting to "make some sense of it all" and stating that:

18  "[y]our funds can be leveraged and are approved to be leveraged IF you can participate in the

19  overall transaction.  The line of credit that Brad gets has been restricted so that the leveraged

20  amounts can only be used to purchase approved instruments for immediate re-sale." *See* Ex. 20

21  to Opp.

22       Third, the government submitted a number of so-called "lulling" e-mails between

23  Hard and the CCG investors, in which Hard purported to assuage the investors' concerns about

24  the location and accessibility of their funds.  In one e-mail exchange, Hard represented to one of

25  the CCG investors that CCG's funds remained frozen in part because Lee had fallen ill as a

26  result of exposure to airborne chemicals aboard a plane on which Lee was a passenger.  Hard

27  purported to send the e-mail from Monaco, where he, Lee, and Montesa had putatively traveled

28  to undertake the investment of CCG's funds.  The text of Hard's e-mail to the CCG investor is

attached as Exhibit 31 to Hard's Affidavit in Support of the Motion.  It reads as follows:

> I apologize for not being able to answer your calls, but I have been watching Brad closely and have been in some meetings during which I couldn't take the calls.
>
> On the way over here, we got bumped from two flights.  Brad and Kristine made a third flight, and I followed the next day.  The Air France flight that Brad was on had the flight attendants spraying insecticide inside the cabin after they were airborne.  This caused a strong negative reaction with Brad.  I was told by Kristine that because of Brad's bad heart, that he actually went unconscious, and she had to break up his heart medication to have it dissolve in his mouth in order to revive him.
>
> Since we have been in Monaco, I have never seen Brad so sick for so long.  He has really only been good for a couple of hours a day at the most.  As a result, our meetings with Claude have been delayed; further, Claude had to go to Paris to attend a surgery for his daughter, and Friday is a Monaco-wide holiday.  Bottomline, our schedule as to when the purchase and sale contracts would be signed, the instruments being purchased being posted on Euroclear, and exiting them out has been delayed.  We now expect that the actual buy/sells will commence on Monday.

Ex. 31 to Hard Aff.

The "buy/sells" did not commence on the Monday after Hard sent his e-mail to the CCG investor.  Instead, three days after sending the e-mail concerning Lee's purported exposure to pesticides, Hard sent another e-mail to the CCG investor explaining the delay in the investment of the funds and reassuring the investor that "[w]e have been at this business for a long time."  *See* Ex. 40 to Hard Aff. at 1.  An attachment to Hard's e-mail informed the CCG investors that Lee's pesticide-induced illness, as well as complications surrounding the

1  forgiveness of debt held by the Iraqi government, had complicated the investment of CCG's

2  funds and could potentially require the return of those funds to CCG with no tax consequences.

3  *See id.* at 2-3.

4           Fourth, the government submitted evidence about the distribution of CCG's funds

5  and amounts alleged to have been received by Hard as a result of the alleged scheme to defraud

6  the CCG investors.  The accuracy of the government's accountings were a source of great

7  dispute at the time of trial; such dispute persists throughout the briefing on the instant Motion.

8  The government specifically called FBI agent Norm Embry as a witness.  The government also

9  sought testimony from Lee about any amounts Hard obtained as a result of the alleged scheme to

10  defraud the CCG investors.

11           Agent Embry testified as to two bank records that revealed the transfer of funds

12  from Cressot to Hard.  The first was a November 2, 2004 transfer of $25,000.  Because the

13  transfer came from a Cressot account that *was not* the bank account to which the investors' $1

14  million was sent, *see* Hard Aff. ¶ 200 (citing Ex. 27 to Hard Aff.), Hard does not consider the

15  transfers inconsistent with his later representation to the investors that "[t]he one thing I am

16  pretty clear of is that nothing has happened with the $1 million that was sent to Cressot's

17  account pursuant to the wire transfer from my account."  Ex. 43 to Hard Aff.; *see also* Hard Aff.

18  ¶ 200; *id.* ¶ 244(c).  The second was a November 30, 2004 transfer of $60,000, which was also

19  sent from Cressot's Swiss Bank Corp. account.  *See* Ex. 27 to Hard Aff.; *see also* Ex. 49 to Hard

20  Aff. (stating to companion that "[h]aving the $60,000 sent to my account did a lot to restore my

21  confidence and faith in what Brad is doing.  At the very least, it does provide evidence that the

22  funds are at least in a high paying money market account that we can draw upon to provide

23  operational expenses.").

24           Lee testified that Hard obtained approximately $200,000 from the $1 million

25  stolen from CCG.  *See* Ex. 87 to Hard Aff. at 59.  On the basis of Lee's testimony, the

26  government asked Embry to calculate Hard's share of CCG investors' $1 million investment.

27  Embry added $200,000 with the $85,000, as well as an additional $50,000 that Embry believed

28  Hard expected to receive, and concluded that the alleged co-conspirators expected that Hard

1  would receive approximately one-third of the $1 million.

2        C.     Prosecutor's Closing Arguments

3        While Hard challenges prosecutorial conduct in eliciting Lee's and Embry's

4  testimony about the disbursement of the CCG investors' funds, Hard argues that the government

5  prosecutors engaged in additional misconduct during closing arguments.

6        1.     Argument With Respect to Freezing of Lee's Funds

7        First, Hard challenges the manner in which the prosecutor attacked Hard's claimed

8  belief – and representations to investors – that Hard was a high-ranking member of the United

9  States armed force, whose funds had been frozen by the federal government.  The prosecution

10  argued as follows:

11        [Lee's] hundreds of millions of dollars in assets were frozen by the

12        US government in order to force [Lee] to put together a paramilitary

13        force of mercenaries, apparently to fight in a war, either presumably

14        Iraq or Afghanistan.

15        . . .

16        The idea itself is silly.  It's ridiculous.  Let's analyze this story like a

17        lawyer would - - like Mr. Hard, a lawyer would.

18        Imagine how this order was issued - - this order to freeze assets was

19        issued.  Someone, apparently, either in the Pentagon or the executive

20        branch, convinced a US District Judge to issue an order freezing all

21        of Lee's assets everywhere, either by totally fabricating some story

22        about him or telling the judge the truth in the hope that the judge

23        would go along with this extortion plot.  Then orders would have to

24        be transmitted to all foreign governments where his assets might be

25        located in order to convince these foreign governments to freeze a

26        US citizen's assets, either on the basis of their fabricated evidence or

27        telling - - or by telling them the truth, also in the hopes that they also

28        will go along with this extortion plot.  The story on its face gets more

1     and more ridiculous with each question that's asked.  The more you

2     delve into it, the more ridiculous this story becomes.

3  Ex. 25 to Hard Aff. at 27-29.

4     The prosecutor proceeded to argue that as an attorney, Hard would have – and

5 should have – investigated the purported freezing of Lee's funds.  *Id.* at 29.  The prosecutor

6 argued that Hard would have asked for "correspondence" concerning the frozen assets, or

7 information about the individual(s) responsible for the freezing of the assets.  *Id.*

8     The prosecutor then rebutted Hard's wife's testimony that Hard performed online

9 research to investigate the veracity of Lee's claims about frozen assets.  Specifically, the

10 prosecutor argued:

11     I'm sure Mrs. Hard was prepared by her attorneys to testify.  There's

12     nothing wrong with that.  And I'm sure that if he had done - - if Mr.

13     Hard had done any more due diligence we would have heard about

14     it.  But all she says was he went online and he found out that the

15     government does seize assets.  Well, of course it does.  Any lawyer

16     would already know that.  And he would already know in exactly

17     what circumstances that occurs.

18     One, you don't pay your taxes; or, two, you're a crook.

19     They seize drug money.  They seize contraband.  They seize

20     instrumentalities of crime.  They seize laundered money when they

21     can find it.  Of course the government seizes assets.  That would tell

22     him nothing about Lee.  And he didn't do any more due diligence.

23     Why not?  He didn't need to.  He didn't have to.  He already know

24     what the score was.  That was for Mrs. Hard's benefit.

25     That was for her benefit.

26     And, again, you have court orders.  All of this would have to lead to

27     only one inescapable conclusion, and that is that the story Lee told

28     them was a complete lie, which we know that it was, and Hard knew

1            it.  Any person would know it.  And certainly a lawyer who knows

2            how the legal system works would know it.

3   *Id.* at 10-11.

### 2.      Argument With Respect to Leveraging of Assets

5          Second, Hard challenges the manner in which the prosecution argued that Hard's

6 references – in correspondence with the CCG investors – to the concept of "leveraging"

7 constituted evidence of fraud.  Specifically, the prosecution argued:

8            Hard tells the partners that Cressot is in the Middle East and that he's

9            leveraging; that the leveraging is going to start.

10            What is leveraging?  Nothing.  Leveraging is nothing.  It's a made up

11            term.  It's a fraud term.

12            But Attorney Hard - - Attorney Hard tells them the leveraging will

13            begin on Tuesday, and then we're going to do a second round of

14            leveraging.

15            No, you're not.  There is no - - it's a fraud term.  It's made up.

16            There's no such thing.

17            How are you going to turn - - how are you going to turn 1 million

18            into 100 million magically with no risk?  Well, we're going to

19            leverage it.  Well, what does that mean?  What does it mean to

20            leverage?  What are you doing?  It doesn't mean anything.  It's

21            mumbo jumbo.

22            But Hard says they're going to do it, and so begins the stall.  And

23            you will see with each succeeding e-mail brings a new reason why

24            the trade isn't working and the money just can't be returned.

25   *Id.* at 16.

### 3.      Argument With Respect to Fumigation on Flight to Monaco

27          Third, Hard challenges the prosecutor's closing argument insofar as it argued that

28 Hard's representations to the CCG investors about Lee's pesticide-induced illness constituted

1   evidence of fraud.  Specifically, the prosecutor argued:

2               Three days later Hard tells the partners that Brad got sick and that he

3               starts - - he starts this in this e-mail, but we're going to see in a later

4               e-mail more detail about this.  But he said the plane was fumigated

5               with pesticides.  All right?

6               Well, let's see the full e-mail where he gives all the details about

7               that.  And here it is.  Again, this is November 18, they're on their

8               way to Monaco, and it says - - and this is Hard saying Brad and

9               Kirstine made the third flight.  I followed the next day.  The Air

10              France flight that Brad was on had the flight attendants spraying

11              insecticide inside the cabin after they were airborne.

12              Now, I want you to think about this for a minute.  I want you to

13              picture this in your mind.  Flight attendants walking down the aisles

14              of a full flight, hundreds of passengers, while airborne, spraying

15              insecticide around the cabin.

16              No one notices this and complains?  This would have been on CNN

17              the next day.  There would have been a huge story about this.  It's

18              just a lame excuse to explain why Brad is so sick, only he isn't.  He's

19              fine.

20  *Id.* at 18.

21          Hard argues that no evidence in the record, including witness testimony,

22  substantiated any of the prosecutor's claims about the frequency and notability of fumigation on

23  airplanes.  Likewise, Hard argues that the prosecution presented no evidence as to the leveraging

24  of assets, which Hard contends is a legitimate and prevalent practice.  And finally, Hard argues

25  that the prosecution presented no evidence as to the freezing of funds without a court order,

26  which Hard argues is also prevalent and permissible under the law.  Thus, according to Hard, the

27  prosecution made arguments unsupported by the record and that such argument in part

28  constituted vouching and resulted in prejudice to Hard.

## II.    Legal Standard

Federal Rule of Criminal Procedure 33 provides in relevant part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Subpart (b) of Rule 33 provides that a motion for new trial may be brought "on any reason other than newly discovered evidence."  Fed. R. Crim. P. 33(b).

The district court has considerable discretion to grant a motion for new trial if, for example, it concludes that "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."  *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).  In evaluating a motion brought under Rule 33, the district court may independently "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."  *Id.* at 1211.  Nevertheless, the district court may not cavalierly replace the jury's reasonable evaluation of the evidence with its own where the evidence does not "preponderate[] heavily against the verdict."  *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (quoting 2 Wright, *Federal Practice and Procedure*, Criminal § 553 at 487 (1969)).

## III.    Discussion

Hard argues that four instances of prosecutorial misconduct warrant a new trial under Rule 33: (1) the prosecutor's elicitation of false testimony from Lee and Embry about the disbursement of CCG funds and the use of certain funds, including CCG funds, by Hard; (2) the prosecutor's rendering of improper opinion testimony during closing argument concerning the freezing of assets; (3) the prosecutor's rendering of improper opinion testimony during closing argument concerning the use of pesticides on aircrafts; (4) the prosecutor's rendering of improper opinion testimony during closing argument about the leveraging of assets.  Hard maintains that not only did the prosecutor's statements have no basis in the record, but that they were in fact false.

The court must evaluate claims of prosecutorial misconduct by examining whether "considered in the context of the entire trial, that conduct appears likely to have affected the

11

1   jury's discharge of its duty to judge the evidence fairly." *United States v. Frederick*, 78 F.3d

2   1370, 1379 (9th Cir. 1996); *see also United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038

3   (1985).  Prosecutors need not simply parrot the evidence at trial, but may strike "hard blows"

4   and draw "all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d

5   638, 652 (9th Cir. 2000) (citing *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629 (1935)).

6              **A.    Testimony Offered by Lee and Embry**

7              Hard's Motion identifies three instances in which the government purportedly

8   elicited false testimony about his finances..  Lee testified that Hard received approximately

9   $200,000 of the CCG investors $1 million.  Lee also testified that Hard received approximately

10  $10,000 per month plus expenses from Lee.  Finally, Embry testified that Hard used some of the

11  CCG investors' funds to finance a trip to Monaco.  Hard argues that documentary evidence in

12  the government's possession prior to trial, including but not limited to subpoenaed bank records,

13  suggests otherwise.

14             **1.    Summary of Records**

15             The Court examined the content of every bank record in the government's

16  possession in order to evaluate Hard's claim that the government knowingly elicited false

17  testimony.  The records shed light on whether the testimony was false and whether the

18  government knew or should have known that it was false.

19             "A prosecutor may not knowingly introduce false testimony, and he has an

20  obligation 'to act when put on notice of the real possibility of false testimony.'" *United States v.*

21  *Inzunza*, 580 F.3d 894, 907 (9th Cir. 2009) (quoting *N. Mariana Islands v. Bowie*, 243 F.3d

22  1109, 1118 (9th Cir. 2001)).  Even if the government presented false testimony, a defendant's

23  entitlement to a new trial is triggered if "there is a reasonable probability that without the

24  evidence the result of the proceeding would have been different." *Id.* (quoting *United States v.*

25  *Young*, 17 F.3d 1201, 1204 (9th Cir. 1994)).

26             Here, the evidence does not indicate that the testimony offered by Lee was false.

27  The Court has reviewed every bank record and accounting offered by Hard and it is clear that

28  they do not tell the whole story.  Cressot, Lee, and Hard – whose financial transactions were

1  reviewed in some depth at trial – used multiple accounts and made multiple transfers over long

2  periods of time.  For example, Brad Lee used at least two accounts – in his own name and one in

3  the name of "Delta North America, Inc."  Cressot likewise used more than one account, a fact

4  Hard expressly relies upon when explaining his representation to investors that their $1 million

5  was intact, even though Hard had received $85,000.  And Hard himself used an "attorney trust

6  account" in his own name that was separate from the "Hardland Holdings, Inc." account that he

7  maintained in the same U.S. Bank location in Utah.

8          The bank records also do not tell the whole story about the relationship between

9  the three men.  For example, Hard and Lee spent time together in Monaco, California, and

10  potentially Nevada.  During their time together, the two men exchanged funds – *e.g.*, the check

11  for $5,000 issued by Lee to Hard while the two men were together.  The two men also

12  intermingled funds regularly and compensated each other's expenses, another fact upon which

13  Hard relies.  Nothing in the bank records reveals that Hard did not have access to at least

14  $200,000 – if not more – as a result of his association with Lee.  Though Hard argues that he

15  provided the government with a "full accounting" showing that "Hard . . . failed to make any

16  money working with Lee [and] never even received full reimbursement," *see* Mot. at 9, that is

17  simply besides the point.  Hard's own accountings and the records he provided to the

18  government do not capture more creative methods for transferring funds (as evidenced by the

19  several bank accounts involved in this case).

20          Nor did the government have any reason to believe Lee's testimony was false.

21  There is no obligation upon a prosecutor to "produce . . . evidence to support [a witness']

22  claims."  *See* Mot. at 9.  The witness speaks for itself.  In this case, Lee testified that Hard

23  received approximately $200,000 of the CCG investors funds and that Lee paid Hard

24  approximately $10,000 per month for his services.  Hard responds that the bank records show

25  otherwise.  However, as discussed, there is no reason for the prosecution to form all beliefs

26  about the facts on the basis of one group of bank records, ***especially*** where, as here, percipient

27  witness testimony contextualizes and even supplements those records.

28          Finally, Hard was not prejudiced.

The jury had ample opportunity to examine the credibility of the testimony offered by Lee and Embry because, after all, the records were in evidence.  Lee underwent a withering cross-examination by Hard's counsel.  So too did Embry, who was questioned specifically and in great depth about the integrity of his accountings, as well as the ability for those accountings to measure up against the facts.

Moreover, "financial gain" is not an element of the crimes for which Hard was convicted.  Indeed, the prosecution itself argued to the jury that it did not need to prove receipt of funds in order to obtain a conviction.  Hard argued during oral argument that the receipt of the CCG funds is probative of a fraudulent state of mind, which was his central defense.  Hard's argument is in part well taken: after all, he and his counsel did not challenge the fact of the CCG transaction or the fact that the CCG investors' funds were misappropriated.

But even if the only fact at issue in this case was Hard's state of mind, the prosecution presented legion evidence as to this fact, much of which was entirely separate from the receipt of funds.  Hard acknowledges as much, since he challenges the conclusions drawn from such "non-financial" evidence during the prosecutor's closing argument.  For example, the prosecutor argued that Hard's "lulling" evidenced a fraudulent state of mind.  The prosecutor also argued that Hard's explanations for his associate's unavailability evidenced a fraudulent state of mind.  Finally, and perhaps most importantly, the prosecution argued that the *fact of the transaction itself* evidenced Hard's fraudulent state of mind, since Hard could not have in good faith drafted the contracts at issue, which he promised unrealistic investment returns:

> Two hundred percent a week, for each full trading week - - there's
> 52 weeks in a year  - - that's 10,400 percent a year.
> Supposing they don't trade during Christmas or Easter or any other
> holidays, let's just round it off to 10,000 percent.  10,000 percent a
> year with zero risk.
> All those CCG partners said oh, no.  There was no risk.  And later on
> in the second joint venture we'll see it actually spelled out no risk.
> You know that's fraudulent.  You know that's fraudulent..  You

1    don't need an expert to tell you that.  And Hard wouldn't need
2    anyone to tell him that either.
3            Just for fun, let's calculate this out.  Let's suppose that there's no
4    compounding of the investment, you're not reinvesting your profits.
5    200 percent a week on 1 million is $2 million.  100 percent is a
6    million and 200 percent is 2 million times 52 weeks in a year, you
7    have $104 million in profit at the end of the year, in addition to the
8    $1 million that you started with.
9            In other words, in this investment you can turn your $1 million into
10    100 million in one year.  No risk.  If you had $100, you could turn it
11    into $100,000 in a year.  If you could scrape together $1,000 to put
12    into this investment, it would turn into $100,000 at the end of the
13    year with no risk.
14            Would you do that?  Of course you would.  Of course you would.
15    The problem is it's fraudulent.  It doesn't exist.  It's too good to be
16    true.
17    *Id.* at 12-13.

18            The records available to the government or in the government's possession do not
19    reveal the testimony offered by Lee and Embry to have been false.  Nor is there any other reason
20    why the government should have known such testimony to have been false.  Standing alone, the
21    testimony offered by Lee and Embry was exposed to vigorous and long cross-examination on the
22    very issues that Hard expresses concern about; namely, the disbursement of the CCG funds and
23    distribution of funds from Lee to Hard.  Indeed, the credibility of both witnesses – and especially
24    Lee – was challenged on cross-examination and the jury had every opportunity to determine the
25    credibility of the witness, measure that credibility against the documentary evidence in the
26    record, and reach its own conclusions about both.  Finally, there was no prejudice: the jury was
27    instructed that receipt of funds was not an element of the crimes at issue, and the prosecution
28    spent substantial time pointing to other evidence as indicative of Hard's allegedly fraudulent

1  state of mind.  The Court declines to invade and speculate upon the jury's decision-making

2  process, which was ably informed.

3                 **B.**      **Prosecution's Closing Argument**

4          As described above, Hard argues that the prosecutor improperly presented opinion

5  testimony and relied on evidence not in the record during closing argument.  The government

6  responds that its statements during closing argument were reasonable inferences on the basis of

7  the evidence in the record.  The government further responds that the jury was instructed to

8  consider only evidence in the record and that any error was therefore not prejudicial.  Finally, the

9  government argues that any error was minimal when compared to overwhelming evidence of

10  Hard's guilt.  For the reasons below, this Court agrees.

11          As stated before, a prosecutor may discuss the law and the facts of the case, as well

12  as all reasonable inferences that the jury could draw, even if they are illogical or erroneous.

13  *Ceja v. Stewart*, 97 F.3d 1246, 1253-54.  Nevertheless, the jury should be permitted to evaluate

14  the credibility of a witness or witnesses for itself, and "vouching" is therefore improper.

15  Vouching "consists of placing the prestige of the government behind a witness through [a

16  prosecutor's] personal assurances of the witness' veracity, or suggesting that information not

17  presented to the jury supports the witness' testimony."  *United States v. Weatherspoon*, 410 F.3d

18  1142, 1147 (9th Cir. 2005).  This is because "the prosecutor's opinion carries with it the

19  imprimatur of the Government and may induce the jury to trust the Government's judgment

20  rather than its own view of the evidence."  *Id.* at 1146.

21          However, "[e]very slight excess of a prosecutor does not require that a verdict be

22  overturned and a new trial ordered."  *United States v. Yarbrough*, 852 F.2d 1522, 1539 (9th Cir.

23  1988) (applying standard in context of challenge to denial of motion for mistrial) (citing *United

24  States v. Chapman*, 615 F.2d 1294, 1301 (10th Cir.), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2947

25  (1980)).  Moreover, the alleged prosecutorial misconduct must have "deprive[d] the defendant of

26  a fair trial" in order to warrant the casting aside of the jury's verdict.  *See United States v.

27  Williams*, No. CR 03-00985 MMM, 2004 WL 5542771, at *3 (quoting *United States v. Ramos-

28  Oseguera*, 120 F.3d 1028, 1035 (9th Cir. 1997)).

1    None of the prosecutor's closing arguments rise to the level of improper

2    "vouching" and, in any event, they did not deprive Hard to a fair trial.  As an initial matter, at no

3    time during the three purported instances of "misconduct" did the prosecutor reference Lee's

4    testimony, or "suggest" that information not presented to the jury supported Lee's testimony.

5    Rather, the prosecutor's closing arguments were made to present evidence concerning Hard's

6    state of mind.

7    Second, Hard was not deprived of his opportunity to a fair trial as a result of the

8    prosecutor's statements during closing argument.  The jury was instructed not to consider

9    evidence outside the record, which (as Hard acknowledges) is ordinarily sufficient.  The

10   authorities relied upon Hard to sustain his claim are unavailing.  *United States v. Newman*, 490

11   F.2d 138 (3d Cir. 1974) involved entirely new factual statements made during closing argument;

12   it did not involve reasonable inferences drawn by the prosecution.  *King v. United States*, 372

13   F.2d 383 (D.C. Cir. 1967) involved misrepresentations of a critical witness' testimony that the

14   court considered relevant to the outcome of the case, unlike here, where the government

15   expressly relied upon the very scheme and investment at issue as probative of Hard's state of

16   mind.  Finally, *United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993) involved an affirmatively

17   false state of fact about a witness that did not appear.  None of these factors is at present here,

18   where the prosecution simply presumed to draw an inference about the consequences of the

19   claims made by Hard to the investors.

20   Finally, Hard was not prejudiced.  As detailed above, the jury was presented with

21   ample evidence of Hard's fraudulent state of mind, including the nature of the CCG transaction

22   itself, as well as the unrealistic promises made to the CCG investors about the rates of return and

23   the risks involved in the transaction.

24   In light of these facts, the Court finds that prosecution's closing argument was not

25   improper and that it did not deprive Defendant of a fair trial.

26

27

28

IV.     **Disposition**

         For the foregoing reasons, the Motion is DENIED.

IT IS SO ORDERED.

DATED: June 23, 2010

                                                  _David O. Carter_
                                        _____
                                                  DAVID O. CARTER
                                              United States District Judge